**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORP., <br><br> Defendant. | C.A. No. 4:18-cv-00519-ALM <br><br><br> **JURY TRIAL DEMANDED** |
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & CO. <br><br> Defendant. | Case No. 4:18-CV-00501-ALM <br><br><br> **JURY TRIAL DEMANDED** |
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> SEATTLE SPINCO, INC. ET AL., <br><br> Defendants. | Case No. 4:18-CV-00469-ALM <br><br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS WAPP TECH LIMITED PARTNERSHIP AND WAPP TECH CORP.'S
OPENING CLAIM CONSTRUCTION BRIEF**

Dated: March 16, 2020

Timothy Devlin (DE 4241)
1526 Gilpin Avenue
Wilmington, DE  19806
(302)-449-9010
tdevlin@devlinlawfirm.com

*Counsel for Plaintiffs Wapp Tech Limited
Partnership and Wapp Tech Corp.*

**Table of Contents**

I.     INTRODUCTION ..................................................................................................... 1

II.    OVERVIEW OF THE PATENTS IN SUIT ........................................................... 1

III.   LEGAL STANDARD .............................................................................................. 2

IV.    SUMMARY OF THE ARGUMENT ...................................................................... 5

V.     ARGUMENT ............................................................................................................ 6

       A.   "system for testing an application for a mobile device"; "system for developing an
            application for a mobile device" ................................................................... 6

       B.   "application" ..................................................................................................... 8

       C.   "simulate"; "emulate" ................................................................................... 10

       D.   "simultaneously visually [simulate/emulate], via one or more profile display
            windows"; "simulate, via one or more profile display windows" ....................... 14

       E.   "configured to" ............................................................................................... 16

       F.   "the software" ................................................................................................. 18

       G.   "the test" ......................................................................................................... 20

VI.    CONCLUSION ...................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*ArcelorMittal France v. AK Steel Corp.*,
    700 F.3d 1314 (Fed. Cir. 2012) ................................................................. 4

*Aventis Pharms., Inc. v. Amino Chems. Ltd.*,
    715 F.3d 1363 (Fed. Cir. 2013) ................................................................. 3

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001) ................................................................. 2

*Bose Corp. v. JBL, Inc.*,
    274 F.3d 1354 (Fed. Cir. 2001) ........................................................... 18, 22

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) .......................................................... 2, 3, 4

*Clear with Computers, LLC v. Hyundai Motor Am., Inc.*,
    No. 6:09-cv-479, 2011 U.S. Dist. LEXIS 990 (E.D. Tex. Jan. 5, 2011) ................................... 3

*e.Digital Corp. v. Futurewei Techs. Inc.*,
    772 F.3d 723, 727 (Fed. Cir. 2014) ............................................................ 17

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
    766 F.3d 1338 (Fed. Cir. 2014) ................................................................. 3

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010) ................................................................. 5

*Halliburton Energy Servs. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ............................................................... 18

*Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ................................................................. 2

*Markman v. Westview Instr., Inc.*,
    517 U.S. 370 (1996) ......................................................................... 2

*Messerschmidt v. U.S.*,
    29 Fed. Cl. 1, 41-42 (Fed. Cl. 1993) ......................................................... 18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ................................................................. 4

*Orion IP, LLC v. Staples, Inc.*,

    406 F. Supp. 2d 717 (E.D. Tex. 2005) .................................................................... 5

*Phillips v. AWH Corp.*,

    415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 2, 3, 4, 11, 13

*Playtex Prods., Inc. v. Procter & Gamble Co.*,

    400 F.3d 901 (Fed. Cir. 2005) ............................................................................... 4

*Polaris PowerLED Tech., LLC v. Samsung Elec. America Inc. et al.*,

    No. 2:17-cv-715-JRG (Dkt. No. 333) (E.D. Tex. June 7, 2019) ............................ 17

*QPSX Devs. 5 PTY Ltd. v. Ciena Corp.*,

    No. 2:07-CV-118-CE, 2011 U.S. Dist. LEXIS 32290 (E.D. Tex. Mar. 28, 2011).................... 5

*ReedHycalog UK, Ltd. v. Baker Hughes Oilfield Operations Inc.*,

    No. 6:06-CV-222, 2008 U.S. Dist. LEXIS 40877 (E.D. Tex. May 21, 2008)........................... 5

*SIPCO, LLC v. ABB, Inc.*,

    No. 6:11-cv-48-LED-JDL, 2012 WL 3112302 (E.D. Tex. July 30, 2012).............................. 17

*SynQor, Inc. v. Artesyn Techs., Inc.*,

    709 F.3d 1365 (Fed. Cir. 2013) ........................................................... 4, 8, 9, 13, 16

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,

    135 S. Ct. 831 (2015)............................................................................................... 4

*Trs. of Columbia Univ. v. Symantec Corp.*,

    811 F.3d 1359 (Fed. Cir. 2016) ............................................................................. 17

*Uniloc 2017 LLC v. Google LLC*,

    2020 U.S. Dist. LEXIS 18710 (E.D. Tex. Feb. 5, 2020) ................................ 4, 9, 16

*Vitronics Corp. Conceptronic, Inc.*,

    90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 3, 13

*Williamson v. Citrix Online, LLC*,

    792 F.3d 1339 (Fed. Cir. 2015) .............................................................................. 3

## I.      INTRODUCTION

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. (together "Wapp" or "Plaintiff") respectfully submit this Opening Claim Construction Brief.  At issue is the proper construction of certain claim terms proposed by Defendants for U.S. Pat. Nos. 8,924,192 ("the '192 patent"), 9,298,864 ("the '864 patent"), and 9,971,678 ("the '678 patent") (collectively the "patents in suit").  (Exs. 1-3.)[1]  Defendants have proposed nine terms for construction and contend that two additional terms are indefinite.

None of the terms needs construction as each is sufficiently clear and should be given its plain and ordinary meaning as it would be understood by those of ordinary skill in the art at time of invention.  For each disputed term or phrase, applying the plain and ordinary meaning is consistent with both the intrinsic and extrinsic evidence and avoids introducing extraneous and confusing limitations or alternate meanings.  Each term as it appears in the claims is also fully consistent with the understanding of one of ordinary skill in the art.  Even Defendants' own expert concedes that the two principal terms that Defendants seek to construe—"emulate" and "simulate"—should be given their plain and ordinary meaning (and yet purports to agree with Defendants' proposed construction of each).

In contrast, Defendants' proposed constructions violate well-settled principles of claim construction and should be rejected.

## II.     OVERVIEW OF THE PATENTS IN SUIT

The patents in suit are directed to methods and apparatuses for mobile app development with device and network simulation.  The specification discloses a system that models an

---

[1] The '864 patent includes the full specifications of the other two asserted patents other than their claims.  As such, citations to the patent disclosures in this brief are to the '864 patent with the understanding that similar language appears in the other patents.

application executing in real time on a mobile device.  The application is played (executed) in real time within the model and monitored to determine resource utilization of the device when executing the application.  ('864 patent at Abstract.)

The specification discloses that "[a]pplications for mobile devices are typically developed on a personal computer (PC) or workstation and target one or more types of mobile device that include a Flash Player."  ('864 patent at 1:34-37.)  The mobile applications benefit from real-time testing on all target mobile devices because, for example, while an application may operate correctly on one mobile device model, it may crash when playing on a different mobile device model.  (*Id.* at 1:37-45.)  Accordingly, it is useful to model resource usage for each target device while executing the application, without needing to actually load the application on the device (or many such devices).  (*Id.* at 1:57-2:2.)  The specification further teaches developing and testing an application with accessibility to all available mobile devices in targeted geographical markets worldwide, as well as real-time interaction with network operators to measure and emulate network characteristics within each market.  (*Id.* at 2:3-7; 10:8-11:27.)

## III.   LEGAL STANDARD

Claim construction is a matter of law.  *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 384 (1996).  In the first instance, it must begin with the words of the claim itself.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'"; quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Courts examine the patent's intrinsic evidence to define the invention's scope.  *See id.* at 1312; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258,

2

1267 (Fed. Cir. 2001).  This intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.

There is a "heavy presumption that claim terms are to be given their ordinary and customary meaning" because "the words of the claims themselves . . . define the scope of the patented invention."  *Aventis Pharms., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).  In the context of claim construction, "ordinary and customary" means how a person of skill in the art at the time of the invention would have understood the term as it is used in the claim.  *Phillips*, 415 F.3d at 1313.  Where the ordinary meaning of claim language is readily understood by a person of skill in the art, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

When necessary to construe a claim, intrinsic evidence is typically "the single best guide to the meaning of a disputed term."  *Phillips*, 413 F.3d at 1315 (citing *Vitronics Corp. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Of course, the claims are "read in view of the specification, of which they are a part."  *Phillips*, 413 F.3d at 1315; *see also Clear with Computers, LLC v. Hyundai Motor Am., Inc.*, No. 6:09-cv-479, 2011 U.S. Dist. LEXIS 990, at *5 (E.D. Tex. Jan. 5, 2011).  A patentee may define his own terms, give a claim term a different meaning, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id.* At 1316.

Generally, it is a "cardinal sin" to read a limitation from the specification into the claims.  *Id.* at 1320; *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015).  This holds even if the specification describes only one embodiment.  *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014).  Conversely, "[a] claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive

3

evidentiary support." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013) (quotations omitted); *Uniloc 2017 LLC v. Google LLC*, 2020 U.S. Dist. LEXIS 18710, at *8 (E.D. Tex. Feb. 5, 2020) (same).

Extrinsic evidence can play a role in the claim construction process, but it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.,* 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id.* at 1318.  Similarly, expert testimony may also be useful on subsidiary factual issues such as, for example, the background science or the meaning of a term in the relevant art during the relevant time period.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

A court should not rely upon such extrinsic evidence to interpret the claim terms where their meaning is clear from the intrinsic sources.  Extrinsic evidence "may not be 'used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"  *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1320 (Fed. Cir. 2012) (quotations omitted); s*ee also Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907-08 (Fed. Cir. 2005).

Further, it bears discussing *what* terms should be construed given Defendants' proposal to construe common terms easily understood by one skilled in the art.  "District courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (emphasis original).  The Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the

meaning of every word in the asserted claims." *Id.* at 1360; *see also QPSX Devs. 5 PTY Ltd. v. Ciena Corp.*, No. 2:07-CV-118-CE, 2011 U.S. Dist. LEXIS 32290, at *14 (E.D. Tex. Mar. 28, 2011) ("In *Finjan*, the Federal Circuit confirmed that a court can resolve a claim construction dispute by rejecting a narrow claim construction and concluding that no additional construction is required . . . .  In short, courts are free to reject overly narrow constructions and rely instead on the plain and ordinary meaning of the claim language"; citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010)); *ReedHycalog UK, Ltd. v. Baker Hughes Oilfield Operations Inc.*, No. 6:06-CV-222, 2008 U.S. Dist. LEXIS 40877, at *5 (E.D. Tex. May 21, 2008).  Thus, "although every word used in a claim has a meaning, not every word requires a construction." *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005).  Here, the terms proposed for construction by Defendants simply do not require construction.

## IV.   SUMMARY OF THE ARGUMENT

None of the claim terms at issue requires construction.  Defendants' proposed constructions are inconsistent with the intrinsic evidence and violate well-settled principles of claim construction, relying on an improper attempt to alter the ordinary meaning of claim terms as those terms are used in the patents in suit.  In addition, Defendants improperly seek to read limitations into the claims to narrow the claims, or to broaden claim terms in a way that is inconsistent with the patent disclosures.  Defendants' proposed constructions should be rejected.

## V.     ARGUMENT

### A.     "system for testing an application for a mobile device"; "system for developing an application for a mobile device"

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "system for testing an application for a mobile device"<br><br>('678 Cl. 1, 26, 45; '864 Cl. 1) | No construction necessary. | "system that mimics the operation of a real-world mobile device to enable the evaluation of a program designed to run on that real-world mobile device" |
| "system for developing an application for a mobile device"<br><br>('192 Cl. 1) | No construction necessary. | "system that mimics the operation of a real-world mobile device to enable the writing of a program designed to run on that real-world mobile device" |

These terms do not have any specialized meaning in the art or in the context of the patents and are sufficiently clear, and, therefore, do not require construction.  Defendants' proposed constructions, on the other hand, introduce unnecessary words with contorted phrasing that are unsupported by the intrinsic evidence and would only serve to confuse the finder of fact.

Each of the phrases here involves common words that are used as they are normally understood in plain English: "system," "testing" or "developing," "application," and "mobile device."  Nothing in these words themselves, nor in the way that they are strung together within each phrase, requires explanation to either a POSITA or a layperson.  The Defendants do not contend that the specification sets forth an express definition for each phrase that would differ from its ordinary meaning.  Likewise, Defendants do not argue that the Applicants disclaimed any subject matter in prosecution.  Instead, Defendants commit the classic errors that are regularly seen with result-oriented constructions; namely, reading in examples from the preferred embodiments or merely substituting narrower terms for those actually recited in the claims.

For example, Defendants improperly attempt to read in the phrase "mimics the operation of" into the recited system.  This error is compounded, as discussed below, by Defendants'

proposal that the term "emulate" be construed to mean "mimic."  There is no basis for incorporating either the term "emulate" or "mimic" into this limitation.  The recited phrases here do not involve "emulating the operation of" a mobile device.  Instead, the recited systems are used for "testing" and "developing" an application for a mobile device, terms commonly understood by a POSITA and a factfinder.

In injecting the word "mimic," Defendants seek to import a preferred embodiment of the specification in which a device model emulates the mobile device itself.  (*See, e.g.*, '864 patent at Figs. 1, 2.)  However, the specification clarifies that the device model 102 is generated based upon certain characteristics of an emulated mobile device (such as processor speed, storage access, RAM size, or pixel depth).  ('864 patent at 4:3-5; 5:20-35.)  As set forth in further detail below, generation of a device model is not "mimicking" the device.  Defendants' attempt to read in "emulation" or "mimicking" of a mobile device into this limitation should be rejected.  *See 3M Innovative Props. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013).

Second, Defendants improperly attempt to narrow the straightforward term "mobile device" into "real-world mobile device."  Defendants have not provided any definition of "real-world" or what type of mobile device is a "real-world" device; regardless, Defendants' limitation of "real world" mobile devices is inconsistent with the specification.  Contrary to Defendants' proposal, the specification makes clear that modeling data may correspond to "mobile device *types* as they become available," including "a new pre-release mobile device, *scheduled release mobile devic*e and current mobile devices."  ('864 patent at 10:41-44.)[2]  Thus the specification teaches modeling types of mobile devices that are *not* "real-world" devices and may never be introduced to the "real world."  This reading out of a preferred embodiment would violate one of

---

[2] Unless otherwise indicated, emphasis within this brief has been added.

the most fundamental principles of claim construction.  "A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support."  *SynQor, Inc.*, 709 F.3d at 1378-79.

Third, Defendants improperly equate "testing" with "evaluation."  The patents contain numerous references to "testing" an application for a mobile device, but no references to "evaluating" an application.  (*See, e.g.*, '864 patent at 9:60-62; Figs. 7-12.)  Similarly, Defendants improperly equate "developing" an application with "writing" one, even though the specification discloses "developing" an application as a process that includes one or more of authoring, simulating, testing, playing, and publishing the application.  (*See, e.g.*, '864 patent at 1:51-2:2; 4:34-51; 10:4-7; 19:18-52.)  Defendants fail to cite any intrinsic support for limiting the term "developing" to  "writing" an application, because none exists.

Defendants' proposed additions to the claim terms are an attempt to rewrite the claims more narrowly under the guise of claim construction and should be rejected.

B.     "application"

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "application"<br><br>('192 Cl. 1;<br>'678 Cl. 1, 26, 45;<br>'864 Cl. 1, 8, 12, 20, 29) | No construction necessary. | "program designed to run on a mobile device" |

The term "application" does not have any specialized meaning in the art or in the context of the patents.  Nothing in this word itself requires explanation to either a POSITA or a layperson.  The Defendants do not contend that the specification sets forth an express definition that would differ from its ordinary meaning, nor argue that the Applicants disclaimed any subject matter in prosecution.  Instead, Defendants again commit the classic error of reading in examples

from the preferred embodiments.  Defendants' proposed construction is redundant in view of the claim language and is inconsistent with the specification.

First, Defendants improperly equate "application" with "program," but provide no basis for doing so.  The patent specification includes numerous references to an "application."  However, nowhere does the specification equate an application to a "program," particularly as the latter term is used to describe software incorporated into an authoring environment—separate from the application itself—to facilitate creation, modification and testing of the application.  ('864 patent at 14:63-65.)  Conflating these two terms would do nothing assist the jury.

Moreover, limiting an "application" to a "program designed to **run**" is flatly contradicted by the specification, which describes developing and testing an application designed to be "**played**" using an "application player" on the mobile device.  ('864 patent at 1:28-34; 2:12-51.)  "Running" an application is, therefore, not the only type of operation contemplated by the invention.  Defendants' proposed use of the phrase "program designed to run" excludes "playing" the applications and is improper.  *See SynQor, Inc.*, 709 F.3d at 1378-79; *Uniloc 2017 LLC*, 2020 U.S. Dist. LEXIS 18710, at *8.

Further, Defendants' qualification of an application as "designed to run on a mobile device" is redundant in view of the claim language.  Each claim reciting an "application" already clarifies that the application is either "for a mobile device" or "play[s] on" a mobile device.  ('192 patent at Cl. 1; '678 patent at Cl. 1, 26, 45; '864 patent at Cl. 1, 8, 12, 20, 29.)  Indeed, the term "application" itself is easily understood by a POSITA and a lay fact finder.  (*See, e.g.,* dictionary definitions set out in Exhibit 4.)  There is no reason to adopt Defendants' proposed limitations on this term.

### C.    "simulate"; "emulate"

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "simulate" | No construction necessary. | "imitate" |
| "emulate" | No construction necessary. | "mimic" |

These terms do not have any specialized meaning in the context of the patents in suit and are used as they are normally understood.  Nothing in these words requires explanation to either a POSITA or a layperson.  The Defendants do not contend that the specification sets forth an express definition for each phrase that would differ from its ordinary meaning, nor argue that the Applicants disclaimed any subject matter in prosecution.  Defendants' proposed constructions simply substitute a different word for each claim term—words that have no clear association with the respective claim terms, and in fact are themselves interchangeable.  This effort is unsupported by the intrinsic or extrinsic evidence and would only serve to confuse the factfinder.

As an initial matter, Defendants' proposed constructions—"imitate" and "mimic"—are *not* supported by the intrinsic evidence in any manner whatsoever.  Those words are not used anywhere in either the patent specification or the prosecution history.  Defendants' cited intrinsic evidence shows only that the asserted claims are directed to methods and apparatuses to author or test an application for a mobile device, which includes, *inter alia*, simulating or emulating network characteristics indicative of performance of the mobile device when executing the application.  (*See, e.g.*, '864 cl. 1; '678 patent cl. 1; '192 patent cl. 1.)

In the absence of any intrinsic support, Defendants rely instead on the testimony of their expert Dr. Shoemake.  (Ex. 5.)  That testimony, however, only serves to demonstrate how confusing and unsupported Defendants' proposals are.  Notably, Dr. Shoemake admitted that the proposed constructions were not ones that he himself came up with, but were delivered to him by

Defendants' counsel.  (Ex. 6 at 38:10-21.)  His "support" for Defendants' proposed constructions should be rejected on this basis alone.  *Phillips*, 415 F.3d at 1318 ("[E]xtrinsic evidence consisting of expert reports and testimony is generated . . . for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence."); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) (finding that an expert's opinions should be disregarded by the court during claim construction because they were conclusory and lacked any substantive explanation tying to the intrinsic record.)

To the extent that Dr. Shoemake's testimony is to be credited, his deposition confirms that "imitate" or "mimic" are improper and imprecise substitutes for the recited terms "simulate" and "emulate."  First, Dr. Shoemake did not testify that his constructions were based on any explicit disclosures in the specification, only that they were based on how a POSITA would view the claims in light of the specification.  (Ex. 6 at 45:9-19.)

In support, Dr. Shoemake testified that he consulted numerous technical dictionaries in rendering his constructions and to "help and assist the Court."  (*Id.* at 23:18-25.)  But even these dictionary definitions undermine Defendants' proposals.  Exhibit 7 shows, in relevant part, the definitions of the two patent terms "emulate" and "simulate" used in the dictionaries that Dr. Shoemake chose to attach to his Declaration, and highlights the numerous inconsistencies with Dr. Shoemake's constructions—most especially how "emulate" is ***never*** defined to mean "mimic" (as Defendants propose) but ***is*** defined using the term "imitate" (which Defendants want to substitute for "simulate").  Conversely, "simulate" is repeatedly defined using the term "mimic," which Defendants want to apply to "emulate."  In other words, Dr. Shoemake's own cited evidence suggests the *exact opposite* of Defendants' proposed constructions.

This is compounded by other extrinsic evidence that Dr. Shoemake admitted to reviewing but failed to cite in his Declaration.  While Dr. Shoemake cited to five technical dictionaries, at deposition he testified that he actually reviewed others, asserting that they were "not applicable" and not "contradictory to anything in" his declaration.  (Ex. 6 at 26:14-25.)  A review of those additional dictionaries, however, confirms that these sources do contradict Dr. Shoemake's proffered definitions.  For example, the definitions of "emulate," "simulate," "mimic," and "imitate" from the MacBook Dictionary (*see* Ex. 8 collecting the definitions and two further common thesaurus listings of the four words), which Dr. Shoemake admitted to consulting (Ex. 6 at 24:16-21, 26:14-19; 76:24-77:9), likewise show a confusing overlap between these various terms.  The confusion is further highlighted on simple examination of how two standard thesauruses list the four terms.  (*see* Ex. 8).  Notably, Dr. Shoemake ***never considered any thesaurus***.  (Ex. 6 at 44:15-23.)

As the dictionary definitions and thesauruses show: (1) "emulate" can mean ***either*** "imitate" or "mimic"; (2) "simulate" can ***also*** mean ***either*** "imitate" or "mimic"; (3) "mimic" can mean "imitate" or "simulate"; and (4) "imitate" can mean ***any of*** "emulate," "mimic," or "simulate."  Defendants' proposed constructions of "emulate" and "simulate" are hopelessly vague, confusing, and circular (or flat out erroneous) and would ***not*** help the finder of fact in any way.  They would instead make it more difficult to understand the claims.

While Dr. Shoemake attempts to draw a distinction between "simulate" and "emulate" based on the alleged degree of precision that each term connotes, and the precision seemingly called for by the specification (Ex. 6 at 43:5-12), his reasoning as to such "precision" is likewise vague, circular, and unsupported by the specification.  (*See id.* at 47:17-48:11, 67:2-19, 86:24-

89:1, 103:11-105:3.)  In all respects, Dr. Shoemake's distinctions are contradicted by the bulk of the extrinsic evidence as discussed above.

In fact, Dr. Shoemake himself was unable to articulate whether or not the breadth of meaning for "simulate" is coextensive with "imitate" (or "emulate" with "mimic") in everyday parlance.  (*Id.* at 72:4-73:24.)  As such, his unsupported assertions regarding the definitions of "emulate" and "simulate" are ***not*** useful to the Court.  *Phillips*, 415 F.3d at 1318; *see also Vitronics Corp.*, 90 F.3d at 1584 ([W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight.")

Additionally, Dr. Shoemake's definition of "emulate" also runs counter to the specification's teachings of "emulating" an application.  (*See* '864 patent at Abstract.)  The patents simply do not teach an ***application*** being "***mimicked***," as Dr. Shoemake conceded during his deposition.  (Ex. 6 at 107:19-24 ("This patent doesn't teach nor would a person of ordinary skill in the art ever think that the application itself is actually emulated or a mimicked version of the application.  It's actually the real application that you're trying to develop to run -- ultimately run on the mobile division").)  Defendants' construction should thus be rejected as it would exclude a feature of every described embodiment.  *SynQor, Inc.*, 709 F.3d at 1378-79.

Indeed, Dr. Shoemake flatly admitted at deposition that "emulate" and "simulate" should be given their plain and ordinary meaning as understood by a POSITA.  (Ex. 6 at 33:10-35:21.)  Therefore, the terms do not require construction.  Just as important, Defendants' proposed constructions would create—rather than remove—confusion and should be rejected.

13

### D.    "simultaneously visually [simulate/emulate], via one or more profile display windows"; "simulate, via one or more profile display windows"

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "simultaneously visually [simulate/emulate], via one or more profile display windows" | No construction necessary. | "[imitate/mimic], while at the same time displaying one or more windows showing in real time resources of the mobile device that are available to the application as a result of the [imitated/mimicked] activity" |
| "simulate, via one or more profile display windows" | No construction necessary. | "imitate, and make available for display one or more windows showing resources of the mobile device that are available to the application as a result of the imitated activity" |

These terms do not have any specialized meaning in the art or in the context of the patents and are sufficiently clear so as to not require construction.  Each of the phrases here involves common words that are used as they are normally understood in plain English: "simultaneously," "visually," "simulate" or "emulate," "profile," and "display window." Nothing in these words themselves, nor in the way that they are strung together within each phrase, requires explanation to either a POSITA or a layperson.  The Defendants neither contend that the specification sets forth an express definition for each phrase that would differ from its ordinary meaning, nor argue that the Applicants disclaimed any subject matter in prosecution. Instead, Defendants once again read in examples from the preferred embodiments or merely substituting narrower terms for those actually recited in the claims.

Defendants' proposed constructions introduce unnecessary words with contorted phrasing that are unsupported by the intrinsic or extrinsic evidence and will only serve to confuse the finder of fact.  As set forth above, the standalone terms "simulate" and "emulate" do not require construction, and even Defendants' expert agrees that those terms should be given their plain and ordinary meaning. (Ex. 6 at 33:10-35:21.)  Similarly, the word "simultaneously" is an easily

14

understood term and Defendants provide no basis for proposing the substitute phrase "while at the same time."

The phrase "via one or more profile display windows" is, likewise, readily understood and requires no construction.  For instance, the patent specification describes profile display windows in Figures 9-12.  The specification teaches that the exemplary profile display window in Fig. 12 includes a pull-down menu of network characteristics that may be simulated by the claimed system, including scripted events, consumer events, and incoming events.  The window also allows for entry of further simulation events.  When the desired characteristics are selected, for instance when "send message" is selected, the window displays profile information relating to the performance of the application while a message is received.  ('864 patent at 11:51-67.)  All of these examples are consistent with the ordinary meaning of "profile display windows."

Further, Defendants' proffered construction that the "resources" shown in a profile display window are a "result of the [imitated/mimicked] activity" is unsupported by the specification.  For instance, the specification describes a "profiler" as a "utility or function that determines or estimates mobile device resource utilization *by an application* running on that mobile device."  (*Id.* at 3:60-62.)  Specifically, the profiler "monitors playing of application 104 to estimate *resource usage of application 104* and generates a profile data display window 110."  (*Id.* at 4:28-30.)  The profile display window identifies areas within the application that would exceed resources of the mobile device, areas within the application placing increased stress on the mobile device or where failure may occur within the application, or live or scripted effects of interaction with a wireless network.  (*Id.* at 4:31-33; 6:50-54; and 10:63-65.)  Defendants' proposed use of the phrase "as a result of the [imitated/mimicked] activity" is arguably restricted

15

to the latter scenario and would exclude the embodiments relating to monitoring resource usage *by* an application.

Indeed, only one embodiment in the specification arguably describes a profile data display window "showing ***in real time*** resources of the mobile device that are available to the application" as a result of a simulated network activity.  (*See id.* at 10:65-11:2.)  Other embodiments describe only that profile data is displayed as the application is played, not as a result of any simulated or emulated activity.  (*See, e.g., id.* at 7:64-65.)  Moreover, this embodiment also allows for profile data to be output as a report, rather than in "real time."  (*Id.* at 7:67-8:1.)  Defendants' inclusion of the phrase "showing in real time resources of the mobile device that are available to the application as a result of the imitated/mimicked activity" is, therefore, inconsistent with many embodiments of the specification and should be rejected. *SynQor, Inc.*, 709 F.3d at 1378-79; *Uniloc 2017 LLC*, 2020 U.S. Dist. LEXIS 18710, at *8.

       E.    **"configured to"**

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "configured to"<br><br>('192 cl. 1, 2, 3<br>'678 cl. 1, 2, 3, 26, 45, 46<br>'864 cl. 1, 2, 8) | No construction necessary. | "actually programmed or implemented with hardware or software to" |

This term does not have any specialized meaning in the context of the patents and is sufficiently clear so as not to require construction.  Defendants' construction, on the other hand, is seemingly adopted from unrelated cases, is meaningless here, and will only serve to confuse the finder of fact.

Defendants appear to adopt their proposed construction verbatim from two prior cases in this District, without regard to the specific patents or technology at issue.  As a threshold matter,

the construction of this generic term from unrelated patents and cases is irrelevant here.

*e.Digital Corp. v. Futurewei Techs. Inc.*, 772 F.3d 723, 727 (Fed. Cir. 2014) ("[C]laims of

unrelated patents must be construed separately."); *Trs. of Columbia Univ. v. Symantec Corp.*,

811 F.3d 1359, 1369 (Fed. Cir. 2016) (finding no basis to construe the terms of unrelated patents

similarly).  In any event, the two cases relied on by Defendants are inapposite; each relies on

facts specific to the intrinsic records in those cases.  The patent at issue in *Polaris PowerLED*

was directed to a "method and apparatus to control display brightness with ambient light

correction" and the claims recited, for instance:

> a first input configured to receive a user signal . . . a light sensor configured to
> sense ambient light . . . a multiplier configured to selectively generate a combined
> signal . . . and a dark level bias configured to adjust the combined signal. . . .

The Court there found that either a "software algorithm" or "analog or mixed signal circuits"

could be used to multiply the light sensor output with the user selectable brightness control.

*Polaris PowerLED Tech., LLC v. Samsung Elec. America Inc. et al.*, No. 2:17-cv-715-JRG (Dkt.

No. 333), at *3 (E.D. Tex. June 7, 2019).

Similarly, the patent at issue in *SIPCO* was directed to a "system and method for

monitoring and controlling remote devices" and the claims recited:

> a computer configured to executed at least one computer program . . . wireless
> transmitter configured to transmit select and information . . . radio-frequency (RF)
> transceivers configured to receive select information . . . and at least one gateway
> . . . configured to receive and translate the select information [and] farther
> transmit the translated information . . . .

The Court found that because the claims defined several devices according to their function, a

mere capability would render the term devoid of meaning.  *SIPCO, LLC v. ABB, Inc.*, No. 6:11-

cv-48-LED-JDL, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012).

By contrast, the claims of the patents here do not define any devices in functional terms

or specify multiple ways of implementing a function.  Instead, the claims merely recite software,

a software testing interface, or a software authoring interface "configured to" simulate (or emulate) a plurality of network characteristics.  ('192 patent cl. 1, '678 patent cl. 1, '864 patent cl. 1.)  The narrowing term "actually programmed or implemented" is unsupported by the intrinsic record and the claim language here.  Moreover, Defendants' construction creates a vague, artificial distinction between software that is *actually* programmed" and software that is *hypothetically* programmed.  Such a construction would inject unnecessary confusion and invite potential mischief, and should be rejected.

### F.    "the software"

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the software"<br><br>('678 cls. 2, 26, 45-50) | Not indefinite.<br><br>A person of skill in the art would understand this phrase to refer to the "software testing interface." | Indefinite for lack of proper antecedent basis. |

Defendants' argument that this phrase is indefinite as lacking proper antecedent basis is wrong both legally and factually.  Legally, even a true lack of antecedent basis alone would not render the claims indefinite if "the scope of a claim would be reasonably ascertainable by those skilled in the art."  *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001); *see also Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable"); *Messerschmidt v. U.S.*, 29 Fed. Cl. 1, 41-42 (Fed. Cl. 1993) ("claims rendered initially indefinite for lack of antecedent basis may nevertheless remain definite when read in light of the specifications").

Factually, the claim language itself, including dependent claims and corresponding claims in the '864 patent, establishes that a POSITA would understand that "the software" refers to the "software testing interface."  The table below compares the corresponding limitations of exemplary claims 1 and 2 of the '678 patent with exemplary claims 1 and 2 of the '864 patent:

| '678 patent | '864 patent |
| --- | --- |
| 1. A system for testing an application for a mobile device comprising:<br><br>**a software testing interface configured to simultaneously visually simulate**, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application;<br><br>wherein the bandwidth availability is based at least in part on bandwidth data predetermined from interactions between one or more mobile devices and at least one operator network. | 1. A system for testing an application for a mobile device comprising:<br><br>**software configured to simulate**, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application;<br><br>wherein the network characteristics are based on data of interaction with networks in non-simulated environments. |
| 2. The system of claim 1, wherein **the software is configured** to enable a user to select from one or more connection simulations for testing how well mobile content performs on the mobile device. | 2. The system of claim 1, wherein **the software is further configured** to capture network profiles from a plurality of geographical locations. |

As shown in the table, the "software" in the '864 patent is "configured to simulate . . . a plurality of network characteristics" (in claim 1) and "further configured to capture network profiles" (in claim 2).  Claim 1 of the '678 patent, in comparison, recites a "software testing interface" that is "configured to . . . simulate . . . a plurality of operator network characteristics."  Claim 2 of the '678 patent mirrors claim 2 of the '864 patent and recites that *the corresponding subject* from claim 1 is further "configured to enable a user to select from one or more connection simulations."  That claim 2 recites "the software" rather than the "software testing

interface" creates no legitimate issue.  A POSITA would, after reading both claims, readily understand that the subject of claim 2 is the same "software testing interface" of claim 1.

Claims 26 and 45-50 are similarly not indefinite.  In all of these claims, a POSITA would readily understand that "the software" refers to the "software testing interface" that is the subject of each claim.

### G.    "the test"

| Disputed Claim Term or Phrase | Plaintiff Wapp's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the test"<br><br>('864 cl. 9) | Not indefinite.<br><br>A person of skill in the art would understand this phrase to refer to the test of the application recited in claim 1. | Indefinite for lack of proper antecedent basis. |

Claim 9 of the '864 patent depends from claim 8, which depends from claim 1.  As set forth above, the preamble of claim 1 recites "[a] system for testing an application for a mobile device."   Claim 8 recites that "the software"—which is part of the system recited by claim 1 for testing an application—is "further configured to create one or more scenarios."  Claim 9 then follows through with narrowing the functionality of the claimed software by specifying that the "scenarios define one or more events that occur during the test."

From even a cursory review of these three claims, a POSITA would reasonably ascertain that "the test" recited in claim 9 is the test of the application recited in claim 1.  Therefore, claim 9 is not indefinite.  *See Bose Corp.*, 274 F.3d at 1359.

### VI.    CONCLUSION

For all of the foregoing reasons, this Court should not further construe any of the terms at issue since they should be given their plain and ordinary meaning.

Dated: March 16, 2020

/s/ Timothy Devlin
Timothy Devlin
tdevlin@devlinlawfirm.com
Henrik D. Parker
hparker@devlinlawfirm.com
**DEVLIN LAW FIRM LLC**
1526 Gilpin Ave
Wilmington, DE 19806
(302) 449-9010

Jeffrey G. Toler
Texas State Bar No. 24011201
jtoler@tlgiplaw.com
**TOLER LAW GROUP, PC**
8500 Bluffstone Cove, Suite A201
Austin, TX 78759
(512) 327-5515

*Attorneys for Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp.*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic filing on March 16, 2020.

*/s/Timothy Devlin*
Timothy Devlin
