# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORP., <br><br> Defendant. | C.A. No. 4:18-cv-00519-ALM <br><br><br> **JURY TRIAL DEMANDED** |
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & CO. <br><br> Defendant. | Case No. 4:18-CV-00501-ALM <br><br><br> **JURY TRIAL DEMANDED** |
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs, <br><br> v. <br><br> SEATTLE SPINCO, INC. ET AL., <br><br> Defendants. | Case No. 4:18-CV-00469-ALM <br><br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS WAPP TECH LIMITED PARTNERSHIP AND WAPP TECH CORP.'S REPLY CLAIM CONSTRUCTION BRIEF**

Dated: April 8, 2020

Timothy Devlin (DE 4241)
1526 Gilpin Avenue
Wilmington, DE  19806
(302)-449-9010
tdevlin@devlinlawfirm.com

*Counsel for Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp.*

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. THE DISPUTED TERMS NEED NO FURTHER CONSTRUCTION .......................... 1

    A. "system for [testing/developing] an application for a mobile device" ............................ 1

    B. "application" .................................................................................................................... 3

    C. "simulate"; "emulate" ...................................................................................................... 5

    D. "simultaneously visually [simulate/emulate], via one or more profile display windows"; "simulate, via one or more profile display windows" .......................... 7

    E. "configured to" ................................................................................................................ 9

    F. "the software" .................................................................................................................. 9

    G. "the test" ......................................................................................................................... 10

III. CONCLUSION .............................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cont'l Circuits LLC v. Intel Corp.*,
   915 F.3d 788 (Fed. Cir. 2019) .................................................................................................. 2

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-cv-0911-JRG-RSP,
   2015 U.S. Dist. LEXIS 151310 (E.D. Tex. Nov. 7, 2015) ......................................................... 1

*Image Processing Techs., LLC v. Samsung Elecs. Co.*,
   No. 2:16-CV-505,
   2017 U.S. Dist. LEXIS 95448 (E.D. Tex. June 21, 2017) ......................................................... 1

*Lites Out, LLC v. OutdoorLink, Inc.*,
   No. 4:17-cv-00192-ALM,
   2017 U.S. Dist. LEXIS 179559 (E.D. Tex. Oct. 30, 2017) ....................................................... 1

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) ................................................................................................ 4

*Silt Saver, Inc. v. Hastings*,
   No. 1:16-CV-1137-SCJ,
   2017 U.S. Dist. LEXIS 216827 (N.D. Ga. Oct. 18, 2017) ......................................................... 1

**I.     INTRODUCTION**

Throughout their Opposition ("Opp."), Defendants repeatedly contend that, simply because Wapp did not provide proposed constructions of the disputed terms, Defendants' proposed constructions must be adopted—regardless of how flawed they are. This is legally incorrect. The Federal Circuit, this Court, and other courts in this District have repeatedly found that construction of terms is *not* necessary where, as here, the terms "have no meaning other than their plain and ordinary meaning and that the surrounding claim language provides sufficient meaning to the words in the claim terms." *See, e.g., Image Processing Techs., LLC v. Samsung Elecs. Co.*, No. 2:16-CV-505, 2017 U.S. Dist. LEXIS 95448, at *27 (E.D. Tex. June 21, 2017); *Lites Out, LLC v. OutdoorLink, Inc.*, No. 4:17-cv-00192-ALM, 2017 U.S. Dist. LEXIS 179559, at *47-51 (E.D. Tex. Oct. 30, 2017). Here, even Defendants acknowledge that the two principal terms at issue—"emulate" and "simulate"—should be given their plain and ordinary meaning. (Opp. at 19.) This Court need do nothing further. Defendants' proposals and purported justifications are inconsistent with the evidence and should be rejected.

**II.    THE DISPUTED TERMS NEED NO FURTHER CONSTRUCTION**

**A.     "system for [testing/developing] an application for a mobile device"**

Even if these preamble terms were "limiting," they do not *require* construction on that basis alone. *See, e.g.*, *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-cv-0911-JRG-RSP, 2015 U.S. Dist. LEXIS 151310, at *31 (E.D. Tex. Nov. 7, 2015); *Silt Saver, Inc. v. Hastings*, No. 1:16-CV-1137-SCJ, 2017 U.S. Dist. LEXIS 216827, at *44-45 (N.D. Ga. Oct. 18, 2017). Defendants cite no contrary authority. As discussed in Wapp's Opening Brief (at 6-8), these terms are sufficiently clear and nothing in the words themselves, or in the way that they are strung together, requires explanation to either a POSITA or a layperson.

1

Conversely, Defendants' proposed constructions would only obfuscate and confuse the issues. First, Defendants' argument for replacing the simple term "system" with "system that mimics the operation of a real-world mobile device" fails to meet the Federal Circuit's exacting standard for importing limitations from the specification. While Defendants argue that the process of emulating a mobile device must be incorporated into the claims because—according to Defendants—the specification teaches testing an application "using an emulated mobile device, not on a real-world, physical device" (Opp. at 6) and "unambiguously disparage[s] the use of real-world, physical mobile devices" (*id.* at 7), the specification is not so limiting.

In fact, the patents repeatedly emphasize that each embodiment is merely "exemplary." (*See, e.g.*, '864 patent at 2:50-55; 3:66-4:2; 5:3-4.) Further, far from "disparag[ing]" the use of "real world" mobile devices, the use of such a mobile device to transfer (*i.e.*, download) the application and execute it is a common step in the application development and testing process. For example, the specification clarifies that the application is "deployed on [physical] mobile device 114 for final testing." ('864 patent at 6:31-33; 4:63-65.) Figures 7 and 13 also illustrate that the application may be tested on a physical device during the development process. (*Id.* at 10:4-7: "emulator 101 instructs development tool 112 to publish application 104 to mobile device 114"; 12:58-59: "In step 1318, method 1300 models the application running within a mobile device"; 9:60-63: "(e.g., mobile device 114) that is a mobile phone.")

It is improper to import a limitation from the specification where, as here, the plain language of the claims does not include the limitation and the specification does not "clearly and unmistakably" require it. *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797-99 (Fed. Cir. 2019) (claims directed to circuit board construction not limited to requiring a repeated desmear process and should be given their plain and ordinary meaning). Indeed, the *Cont'l Circuits*

holding was reached despite the fact that the specification not only "repeatedly distinguishe[d] the process covered by the patent from the prior art and its use of a 'single desmear process,'" but also characterized "the present invention" as using a repeated desmear process.  *Id.* at 794.  Defendants' proposed restriction does even worse in that it would exclude even exemplary embodiments of the specification.  It should likewise be rejected.

Second, Defendants fail to provide any justification for replacing the commonly-understood words "testing" and "developing" with "evaluation" and "writing."  The specification teaches that the process of "developing" an application involves more than merely "writing" it—development may involve one or more of authoring, simulating, testing, playing, and publishing the application.  (*See* Br. at 8, citing '864 patent at 1:51-2:2; 4:34-51; 10:4-7; 19:18-52.)  Similarly, "testing" may include at least simulating, playing, and publishing the application, as well as "evaluation."  ('864 patent at 1:51-2:2; 4:34-56; 9:60-10:7; 11:60-67; 13:4-65; 19:18-52.)  Defendants *never* address these disclosures in the specification.

Third, Defendants' attempt to narrow the term "mobile device" to "real-world mobile device" again ignores the specification.  The specification teaches running an application on a physical mobile device (*e.g.*, *id.* at 6:31-33; 9:60-62; 10:4-7; 12:58-59), as well as the possibility of modeling the application on devices that may never be introduced to the "real world."  (*Id.* at 10:41-44; 6:10-14.)  Defendants' construction improperly excludes all such planned or future devices as well as disclosed combinations of real and virtual devices and should be rejected.

### B. "application"

Defendants' construction ignores that the specification describes an "application" as distinct from a "program."  For example, an exemplary "frame-based application" may be "played" in an "application player" on a mobile device (*id.* at 3:66-4:2; 1:28-30), developed using a "frame-based application development tool" such as "Flash MX or Studio 8 from

3

Macromedia" (*id.* at 4:34-39), or "published" to the mobile device (*id.* at 4:39-43). Defendants cite no evidence that a "program" would have any of these features. In addition, the specification teaches that an application may already be "running" on the mobile device, not merely "designed to run."[1] (*Id.* at 12:58-59.) The only support that Defendants provide for equating an "application" to a "program"—a dictionary definition (Opp. at 13-14)—should be rejected because it contradicts the scope of the "application" in light of the intrinsic evidence.

Further, Defendants' proposed construction would render superfluous the actual claim language immediately following "application." Each relevant claim already recites that an "application" is either "for a mobile device" or "play[s] on" a mobile device ('192 patent at Cl. 1; '678 patent at Cl. 1, 26, 45; '864 patent at Cl. 1, 8, 12, 20, 29), so defining "application" by use of the phrase "designed to run on a mobile device" would be repetitive and should be rejected. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored"). For example, the preamble of '864 patent claim 1 would read: "A system for testing [a program designed to run on a mobile device] *for a mobile device*." While Defendants claim that their construction is "not redundant" (Opp. at 13), the language of the claims establishes the opposite. Indeed, because the surrounding *claim language* shows that the "application" is more specific than its normal use, Defendants' purported justification for narrowing the term itself—to reflect a narrower understanding than its ordinary meaning (Opp. at 11-13)—is redundant.

The term "application" is easily understood by a POSITA and a lay fact finder and there is no reason to adopt Defendants' proposed redundant and unsupported limitations.

---

[1] Defendants' purported compromise—"replacing 'run' with 'play'"—only makes matters worse. (Opp. at 14.) The "application" encompasses both "running" and "playing."

4

### C. "simulate"; "emulate"

Defendants spend six pages discussing the use of "emulate" and "simulate" in the patent specification (Opp. at 14-20), but fail to tie any of that explanation *to Defendants' proposed constructions*. Instead, those proposed constructions (substituting the single words "mimic" and "imitate") find *no support at all* in the intrinsic evidence, actually blur the differences between "simulate" and "emulate," and are markedly less "nuanced" than the claim terms themselves.

First, while Defendants and Dr. Shoemake attempt to explain the difference between "emulate" and "simulate" in terms of their relative degree of "fidelity" or "precision," (Opp. at 15-17), even a cursory review reveals that the words "mimic" and "imitate" *do not reflect any potential difference in precision*. As discussed in Wapp's Opening Brief (at 10-13), *both* "emulate" and "simulate" can mean *either* "imitate" or "mimic"—Dr. Shoemake's own MacBook dictionary (which he reviewed but failed to disclose in his Declaration) shows this. Whatever "the answer" is that Dr. Shoemake supposedly can provide regarding the meaning of the terms (*see* Opp. at 19), the proposed constructions are far from it.

Indeed, *none* of the technical dictionaries that Dr. Shoemake cited defines "emulate" as "mimic." (Shoemake Decl. at ¶ 43.) Dr. Shoemake's *only* explanation for that construction is his conclusory assertion that: "I refer to this relatively precise representation as 'mimicking' a target." (*Id.* at ¶ 36.) Tellingly, while Dr. Shoemake regularly used "emulators" and "simulators" in his professional work (*see id.* at ¶¶ 5-6, 48), he did not testify to using any "mimickers" or "imitators." His opinions are, thus, not based on any specialized technical understanding, but appear to be unsupported rationalizations designed to support Defendants' preselected constructions.

Second, Defendants inaccurately fault Wapp for not referring to any technical dictionaries in evaluating these terms. (Opp. at 18). On the contrary, Wapp cited *the same*

5

"technical" dictionaries that Dr. Shoemake relied on. (Br. at 11; Ex. 7.) Wapp merely pointed out that these dictionaries both highlighted the numerous inconsistencies with Dr. Shoemake's constructions and, in fact, suggested the *exact opposite* of Defendants' proposed constructions. Wapp also cited two additional "technical" dictionaries (Br. Ex. 4), neither of which alter the analysis. In sum, *every* dictionary (technical or "non-technical") relied on by either side undermines Defendants' position that the limitations here are so "nuanced and technical" that "they would not be understood by a lay juror." (Opp. at 18.) The evidence entirely confirms that these terms do *not* have any specialized meaning in the context of the patents.

Third, Defendants' argument that Wapp "wants to use the terms ['emulate' and 'simulate'] interchangeably" (*id.* at 18) misstates the issue (and Wapp's position). Wapp has repeatedly emphasized that the differences between the limitations are simply not reflected in Defendants' *proposed constructions* (i.e., "mimic" and "imitate") which *are* more synonymous with each other than the claim terms themselves. Indeed, Defendants' single-word constructions belie their own assertion that "[t]he point is not to provide a one-to-one replacement of synonymous words" but to "provide meaning to words or phrases." (*Id.* at 19.) The proposed constructions here provide no such "meaning" to the finder of fact and would, instead, make it more difficult to understand the claims.

Fourth, Defendants provide no authority for their contention that it was "error" that Wapp "failed to rely on the written description at all." (*Id.* at 18.) Wapp was justified in doing so for two reasons. First, Wapp believes the terms are plain on their face and require no construction. Second, it is Defendants that desire to change the words that the Applicants and the Examiner agreed were sufficient to define the invention, so it is their burden to demonstrate why the words should be replaced, but their proposed constructions find no support in the specification. Indeed,

6

Wapp simply highlighted that the proposed constructions—of terms only Defendants contend require construction—are so vague, confusing, and circular (or erroneous) that they would ***not*** help the finder of fact but would instead make it more difficult to understand the claims.

These terms require no construction, and certainly not Defendants'.

### D. "simultaneously visually [simulate/emulate], via one or more profile display windows"; "simulate, via one or more profile display windows"

Defendants' proposed constructions should be rejected. First, as discussed above, neither "simulate" nor "emulate" means simply "imitate."[2]

Second, Defendants' entire premise for construing these terms is faulty. Defendants argue that—but for their proposed construction—a fact-finder may misinterpret the claims as reciting that "the profile display window would ***do*** the emulation or simulation." (Opp. at 22; emphasis original.) It is common knowledge, however, that a computer screen is not a microprocessor; and instead displays the results of processing done elsewhere within a computer. This is basic knowledge in the computer era, whether at the time of the invention or now. There is no meaningful risk that a fact-finder would read the claim language to require that the display window itself performs the emulation (or simulation). Moreover, the context of the surrounding claim language confirms this common understanding. For example, the word "via"—which Defendants seemingly ignore but which carries meaning here—sufficiently informs that the results of a simulation or emulation are visually presented in a "profile display window."

Third, the specification is not limited only to monitoring an application "in real time." For instance, the specification teaches that profile data may alternatively be output as a post-simulation report. (Br. at 16; '864 patent at 7:67-8:1.) Defendants attempt to sidestep this point

---

[2] Defendants' basis (an alleged "drafting error") for proposing "imitate" for "simulate" and "emulate" here is speculative and unsupported by the record. (*See* Opp. at 17 n.10; 20 n.11.)

7

by arguing that "in real time" corresponds to the "simultaneous" visualization recited in the claims (Opp. at 22), but Defendants' proposed use of the phrase "while at the same time" already accounts for the term "simultaneous." Moreover, the surrounding claim language clarifies that "simultaneously" qualifies the "*plurality*" of simulated network characteristics.

Fourth, Defendants' assertion that "profile display windows" are limited to displaying "resources of the *mobile device* that are *available to the application*" ignores key disclosures of the specification. First, as Defendants concede (*see id.* at 25), a profile display window primarily displays resource utilization *by* an application. ('864 patent at 3:60-62; 4:28-30; 10:60-65.) Defendants' cited excerpts do not alter this fact. For instance, a reduction in resources available to the application simply modifies the operating environment for the application, such that the profiler continues monitoring (and displaying) subsequent resource utilization *by* the application. (*Id.* at 10:60-11:6.) The *purpose* of the profile display window (and, indeed, the stated purpose of the invention to monitor resource utilization by the application (*id.* at Abstract; 2:11-46)), thus, does not change simply because of other activity. Moreover, as Defendants' other excerpts clarify, resources available to the application are merely indicated by a *static* "capacity line," while the profile display window displays resource utilization *by* the application over time. (*Id.* at 20:48-54; Fig. 21.) Second, Defendants' cited excerpts also confirm that a profile display window displays resources of the *network* that are available to the application. (*Id.* at 10:65-11:2.) Defendants' proposed construction, thus, mischaracterizes their cited disclosures.

Defendants argue that resource utilization is recited by other claims and is outside the scope of the limitations at issue here, but neither claim 13 nor claim 20 recites the display of "resource utilization" in a "profile display window." Accordingly, the profile display windows in the limitations here should not be restricted as proposed, and no construction is necessary.

### E. "configured to"

Defendants' *only* justification for adopting a construction verbatim from unrelated patents is that, as a "term of drafting art," the phrase has a "narrow definition in patent law." (Opp. at 28.) Even if that were true (and Defendants have not shown it to be), Defendants' actual proposed construction here should be rejected. First, Defendants provide no basis for including "hardware" in claims that do not recite hardware. Defendants' oversight during their copy-and-paste process should not be rewarded by adopting a construction without regard to the specific technologies. Second, Defendants' injection of the word "actually" is likewise baseless. It is redundant and adds nothing that would assist the fact-finder. Such a construction would inject unnecessary confusion and invite potential mischief, and should be rejected.

### F. "the software"

Defendants' argument that "the software" lacks antecedent basis in claim 2 of the '678 patent ignores the plain language of the claims. Claim 1 recites, in relevant part: "a *software* testing interface configured to simultaneously visually simulate . . . ." The word "software" thus describes the "testing interface" that is configured to perform the claimed simulation. Claim 2 then recites that this *same* "software" is *further* "configured to enable a user to select from one or more connection simulations . . . ." Even a cursory review clarifies—and a POSITA would have no doubt—that "the software" in claim 2 refers to the "*software* testing interface." Nor would a POSITA regard the "software testing interface" as anything narrower than the "software" recited in the analogous claims of the '864 patent. The claims of both patents recite "software"; the '678 claim merely clarifies that the "software" is also a "testing interface."

Defendants seek to blur the plain language by suggesting alternative interpretations of "the software" (Opp. at 29) to manufacture an indefiniteness issue. The preamble does not mention any "software," so a POSITA reading claim 2 would not understand "the software" to

9

refer to the overall system of claim 1. Similarly, no POSITA would believe that the ***application being tested*** would allow a user to "select from one or more connection simulations" to test itself. That functionality is clearly within the testing interface.

Defendants next argue that claims 47-49 create additional ambiguity between "software" and "software testing interface" by assuming—wrongly—that a "software testing interface" cannot "import real-world mobile network profiles" as interfaces "frequently refer to the visual presentation of information." (*Id.* at 29.) Such a characterization is wishful thinking unsupported by any intrinsic evidence. As set forth above, the plain language of the claims confirms that a "software testing interface" visually simulates network characteristics ***and*** imports real-work network profiles. A POSITA would have no doubt as to the scope of the "software" in claims 47-49.

### G. "the test"

Defendants again ignore the plain language of the claims. Defendants argue that "the test" in claim 9 of the '864 patent is so "vague" that it cannot be understood without imposing additional restrictions on the "testing" recited by claim 1. As with "the software," Defendants simply seek to manufacture an indefiniteness issue here by demanding to know whether "there has been a single test or series of tests, and whether the event in question occurred during the same test or in an earlier, now-concluded test." (Opp. at 30.) These additional limitations are unsupported by anything in claim 9 and should not be imported into the claim. Instead, as set forth in the Opening Brief, a POSITA would reasonably ascertain that "the test" recited in claim 9 refers to a test of the application in claim 1. Claim 9 is, therefore, not indefinite.

### III. CONCLUSION

For all of the reasons above and in Wapp's Opening Brief, this Court should not further construe any of the terms at issue and they should be given their plain and ordinary meaning.

| | |
|---|---|
| Dated: April 8, 2020 | */s/ Timothy Devlin* <br> Timothy Devlin <br> tdevlin@devlinlawfirm.com <br> Henrik D. Parker <br> hparker@devlinlawfirm.com <br> **DEVLIN LAW FIRM LLC** <br> 1526 Gilpin Ave <br> Wilmington, DE 19806 <br> (302) 449-9010 <br> <br> Jeffrey G. Toler <br> Texas State Bar No. 24011201 <br> jtoler@tlgiplaw.com <br> **TOLER LAW GROUP, PC** <br> 8500 Bluffstone Cove, Suite A201 <br> Austin, TX 78759 <br> (512) 327-5515 <br> <br> *Attorneys for Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp.* |

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic filing on April 8, 2020.

*/s/Timothy Devlin*
Timothy Devlin
